I would like to address two issues today. The first is the defendant's motion to suppress and the second is the objective to admission of a late disclosed, seriously incriminating text message from Mr. Mercer to the alleged co-conspirator Brady Dix. As to the motion to suppress, reasonable suspicion may not be based on mere propinquity. Mere propinquity was all the government showed here. The planned cocaine deal between Jones and McGee had already happened at McGee's home in Gorham before McGee arrived at Rusky's. H.F. Buchanan was aware of no other drug transactions that day. He points to nothing in the calls that indicate that he was planning some other drug transaction other than with Mr. Jones. As far as when Mr. McGee arrived at Rusky's, McGee approaches the gold Saturn. He leans in, quote, just for a moment through the open driver's side window. He then talks to a man standing on The second, quote, leaning happened after McGee came back out of Rusky's. At that point, the defendant is in the driver's seat of the gold Saturn, presumably about to drive away. McGee either leans on, H.F. Buchanan basically says both. First he says he's sort of leaning on the passenger window and then I believe on cross-examination says, oh, he's leaning actually inside the passenger window and he's talking to the driver through that window. Okay, so the government says that there are at least three reasons why this stop had a suspicion basis. The first is that the cops understood that what was going on with Rusky's and with your client being there was reasonable suspicion of drug dealing. The second is a change in lane without giving a signal and the third is a left turn, again, without giving a signal. That's the way I understand it. Why wasn't there reasonable suspicion just based on the suspicion of drug dealing alone? I will certainly address that first, then because the reasonable suspicion has to be based on specific articulable facts and as particularized to Mercer himself. And so at the time, they don't know who Craig is. I think it's fair to infer that the person waiting on the sidewalk and on his phone is the court Craig, but they don't know who he is and H.F. Buchanan admits he could be a social conduct I don't know. Drug dealers have friends who aren't drug customers. They have other parts of their lives. He admitted that. So we don't know who Craig is. And the other thing is that this court and Yabarra, the Supreme Court in Yabarra, makes clear, again, mere propinquity from the wiretaps that somebody involved in this drug dealing arrangement would be at Rusky's. That was Jones. First the drug deal was supposed to go down at Rusky's. Then Jones calls back McGee. He says, hey, where are you? I'm expecting you here. And he does not answer. He says, well, I'm running late. Would you rather come, would you rather basically pick up the quote killer shit, i.e. the cocaine, would you rather just pick it up here at my home? And Jones says, yeah, I'll be there. And an agent, of course, confirms that Jones did indeed show up with his girlfriend. He goes in very briefly. I don't think it was longer than ten minutes he was inside. He comes back and agent calls up agent Buchanan and agent Buchanan confirms, yes, okay, so that drug deal happened. That cocaine transfer that we knew about from the calls, that just happened. So now they're just, they're surveilling Rusky's because they want to see basically if something else happens. Doesn't McGee say in one of the calls and leave Craig where he is at Rusky's? Tell Craig to wait there. Yeah. Why isn't that a problem for you? Because that doesn't show that he's a drug customer. Well, the question isn't what the proof that it is. It's just whether it would be enough for probable cause in the sense that it's not as if they show up at Rusky's looking for another drug deal. And lo and behold, there's a person they'd never heard of before who's there. That happens to be Craig. Then you might say that's just mere perplexity. We don't know anything about it. But this isn't that. This is, they know in advance they're looking at a drug deal, the people engaged in the drug deal, what they think is a drug deal. Say there's going to be another guy there, tell him to wait there. They then show up and they see he's in fact waiting there. He doesn't go into the restaurant, doesn't seem to be doing anything else. They go and see the people who they think are engaged in the drug deal talking to the guy. Why isn't that enough to say that's probable cause, that this person isn't just merely there, he's there for the purpose of engaging in a drug deal? They could be wrong. But in terms of just enough for probable cause, why isn't that enough for probable cause? Well, because the question is wait there for what? And so it's not as if, by the way, that the surveillance... Well, what would be the answer to that? It seems that law enforcement would be entitled to say, wait there for the drug deal, which is what we think is going on down there. But the drug deal, of course, they knew, based on collective knowledge, they all knew that already happened because it was only going to be with Jones. Well, they also thought that there was one going to go down at Ruski's. Do you think it wasn't probable cause to think there was going to be a drug deal going down at Ruski's? No, they had a hunch that something might also happen at Ruski's after that. Let me ask you, is your argument dependent on us concluding that they didn't even have probable cause to think there was any drug deal that was going to happen at Ruski's? I don't think it's dispositive, but it doesn't help my cause. So you assume that they thought there was probable cause to believe there was going to be a drug deal going down at Ruski's. Yes. But I assume there would be probable cause to think that Craig was involved in it, given what they had heard on the call beforehand, that Craig should wait there at Ruski's, and that when they get to Ruski's, Craig doesn't do anything to make him look like he's a customer at Ruski's. He's just hanging out, waiting, talking to these guys. Well, to that very point, it's clear from the record, and I'm going off of call 1309, which was the last call between Jones and McGee, before Jones goes to McGee's house. That was around 10.30 a.m. The police log, when Agent McKinnon calls in for the identity stop, make your own suspicion for a traffic violation. That happened at 11.42. So my point in saying that is it's a little over an hour of their total surveillance, which of course includes the interactions between McGee and Mr. Mercer. So it's not like they're sort of surveilling the place for hours and hours, and they just see this guy for hours waiting outside, not doing anything, except waiting. To work against you, not for you. But could you answer the question, are the traffic violations an independent ground that would have provided adequate suspicion for the stop? No, because the plain terms of the main statute in question do not allow for that stop. There's no traffic violation. First of all, there's no prohibition under the main traffic code for changing or moving lanes without signaling. That's plain on the statute's own terms. I thought you were supposed to do it if it will improve the safety of the driver in the other lane, and therefore an officer could reasonably think that a left turn signal should have been given on the first of the two violations. No, Your Honor, the first section of that statute states that no one may turn or move lanes unless it's done in a reasonably safe manner. It says nothing about signals. The only time signals comes up is in that next section with regard to turns only. So that's my idea, that there's no, I mean, the lanes were marked as far as the turn itself. The lanes were clearly marked. There are two, in each lane actually, there are two left signals on the left road, and then the right veering lane has a very clear marker going that way. He's staying in his middle left lane. I don't think that was correct information, that he's staying in his lane. If he had put on his left blinker, it could have been misleading to the drivers to his far left, it would have said, oh, he's about to move into my extreme left lane, when he wasn't actually going to do that. So I don't think there's any common sense argument that that would have or could have affected traffic, the fact that he did not signal. I'm sorry? Okay, and the issue of a reasonable mistake of law by the officer is not in this case? Unless they can show, unless the government can show that it's reasonable to assume that traffic may be affected by his not signaling left, even though there were plenty of indicators, including the markings, including the trees. No, no, I'm not talking about the final one. I'm talking about the prior one. Oh, the changing lanes? I can't remember which, I know I cited a couple of cases in my brief about this, that the police officer can't essentially ignore the facial terms of a statute, even after Hine, I think I'm saying that right, even after the Supreme Court's decision that if it's facially not supported by the statute, then it's an unreasonable mistake. Okay, do you want to move on to your text message argument? Just very quickly, about one week before trial, the government dumped a vast amount of phone records taken from the defendant's phone to trial counsel. The trial prosecutor at that time emailed trial counsel saying, I'm not going to use these in my case in chief. After that, the problem is that the prosecutor lay in wait, and then he counted on trial counsel not to review those records, and counted on the defendant not knowing what was in those records, and as a result of that gamesmanship and trial counsel's own failure not to see the continuance of the trial, trial counsel was ineffective. That ineffectiveness not only led to prejudice in terms of the incriminating nature of the defendant's two tires text message to Brady Dix, but also undermined Mr. Mercer's fundamental decisions under the Constitution, whether to go to trial or whether to plead guilty, whether to take the stand or not. The first time this two tires text message was known to trial counsel was actually very far into Mr. Mercer's cross-examination. And then there was a sidebar. And then there was discussion about whether this message is going to be admitted or not. And I think the reason why the judge abused his discretion is that he didn't, I think, appreciate the magnitude of the prejudice here of this incriminating message. He just said, well, it's just one, right? It's just one statement. I'm going to let the prosecutor ask those questions when really one statement alone, basically I did it, is enough to be severely detrimental. Thank you. Thank you. Margaret McGoy for the United States. I plan to spend the bulk of my time on the suppression issue, but I did want to correct one statement that was just made with respect to the two tires text. That message was turned over to the defendant five days before trial. The prosecutor represented at the time that he would not use it in his direct case, but he specifically made no promises about cross-examination. He, in fact, honored that promise. He did not use it in his direct case. The defendant's reply brief directs the court to a section of the record in which the word tire is mentioned, but that is out of context. That was in the context of Agent Buchanan describing for the court and the jury what coded messages meant. It did not specifically refer to that text. But the point is that was disclosed. The prosecutor abided by his promise. I will get to the rest of that argument in a moment, but I did want that to be corrected at the moment. As I understood it, there was no finding whatsoever of bad faith on the part of the prosecutor or lying in wait. But on the question of the ineffective assistance claim, normally we would leave that for a subsequent proceeding. Do you have a point of view on that? I certainly do, Judge Lynch. The defendant's reply brief has relied extensively on United States v. Constant, an opinion about which the three of us have a great deal of familiarity. In the government's view, Constant does not help the defendant at all for several reasons. One is Constant was not a wholesale abrogation of this court's decades-long precedent holding that claims of ineffective assistance of counsel should not be considered for the first time on appeal. Second, in the government's view, there are four critical facts that distinguish this case from Constant. One is the court found in Constant that the facts were not in dispute because there was a letter, there was a written document as to what counsel's advice was. There's nothing of the sort in this case. The second is that the court saw from that letter... We don't have evidence here that counsel never saw the text message? We have evidence that that was provided to counsel. I understand it was provided, but I thought that the record showed that counsel was saying that he had not seen it. My understanding of the record, Judge Barron, is that when the prosecutor started to cross-examine the defendant with that text message, the defendant said, wait a minute, I just got that at the last minute. And the court said to him, what's the prejudice to you? What's the prejudice to you? Whether he looked at it or not, he certainly had it. That's not relevant to the ineffective assistance point. What's relevant to the ineffective assistance point is whether counsel saw it. So for purposes of Constant, I thought the record was clear that there's no dispute that counsel never saw, because he never took the time to look, and saw that text message. Is that not true? I beg to disagree with you, Judge Barron, that I think the record is by no means clear that defense counsel didn't see it. I think defense counsel may have relied on the prosecutor's promise not to use it in his direct case, but I don't think... But in other words, he never advised... He never... In terms of determining whether counsel's performance was deficient, what is missing from the record that you want to know? Absolutely everything, Judge Barron. We need to know when defense counsel got it, according to his version, whether he looked at it, whether he discussed it with his client, whether he and his client worked out this I'm just fixing cars defense in advance. What his thought process was when it was elucidated, whether when it was elucidated he thought, oh my gosh, the prosecutor is... He lived up to his promise with respect to direct examination, but I didn't really think he was going to use it in cross-examination. I thought he'd forget. All of that is information that we would need to get at an evidentiary hearing. Why would that help determine whether it was deficient performance or not, that he made a judgment that he thought it wouldn't be used? Because he may have made a calculated decision just to let it be buried. Let the prosecutor rely on his promise that he's not going to use it. Let the prosecutor think, well, we've agreed, so maybe I ought to extend it. Are there any number of explanations for why counsel behaved the way he did in response to this? But a critical point is the judge specifically asked him, what is the prejudice to you from letting the prosecutor cross-examine about this one text? And put that in context, Judge Barron, because the court excluded two other texts. The court only allowed this one text, and the cross-examination was really quite limited on that. He asked why he was prejudiced. The defendant said, well, my defense might have taken another tact. Well, maybe I would have advised the defendant to plead guilty. But he did not identify any concrete trial strategy that changed as a result of the use of this text on cross-examination. It is plausible, though, that given he viewed this as an open admission, that he might have pleaded guilty if he had seen it. And that's an issue that needs to be explored on 2255. Definitely, but prejudice gets measured in different ways. It does. And the context in which the prejudice needs to be measured now is in the context of the standard of review with respect to purported late disclosure of evidence. It's not the standard with respect to ineffective assistance of counsel, which is down the line. No, it's not. That's what we're trying to ask. Well, we have two questions. Sometimes we treat it now. Sometimes you do. OK, so for purposes of prejudice, if we treat it now, this seems like a pretty good prejudice argument. And I'm saying you can't find prejudice now, which means you can't find prejudice for purposes of strict and reasonable. And why couldn't we? You couldn't because compare what the defense did at the suppression hearing with what the defense did at trial. At the suppression hearing, there was a late disclosure of evidence. Trial counsel said, wait a minute. I need time to digest it. He got a two-week continuance. In this case, he never asked for a continuance. And one of the demonstrations of prejudice that this court has considered is whether in response to the late disclosure, the defendant asks for a continuance. But that's proof of the prejudice from the ineffective assistance because there was no request. Well, no, it's not proof of it, Judge Barron, because reasonable counsel could say, wait. If I ask for continuance right now, that's only going to draw the jury's attention to this text message and make them think that there's something worse about it than there is. I've got a different way of addressing that. We're going to take a slightly different tack. And instead of saying, Mr. Mercer, what were you doing? I had no plans on that day. But that goes to whether it's a strategic choice, I think. Correct. OK, I understand that. But that gets back. But that can't be examined on direct appeal. And may I simply comment on remanding something on direct appeal as opposed to on Section 2255? And I think Ms. Barnwell will agree with me. Nobody knows what the rules are in that context. Everybody knows what the rules are in the context of 2255. And so unless there is some compelling reason not to defer to a Section 2255, in the government's view, the court should adhere to its longstanding precedent that it will not resolve claims of Sixth Amendment ineffectiveness on a direct appeal and leave this to a Section 2255. It's not as if the defendant will never have his day in court on this. He will. The question is whether it will be after an affirmance on all of the other grounds that were raised in this appeal or whether it will interrupt those proceedings. And the government urges the court to decide the other issues and remand without prejudice to the ineffectiveness claim. My time is getting short. And I do want to address the search and seizure issue. Because there are two preliminary points that I think are very significant for putting that in perspective. One is that the government has consistently maintained that the defendant did not have standing to challenge anything with respect to the Saturn. The government agrees that the defendant has standing to challenge the stop of his person and the search of his person. But that doesn't get him very far. Because the only things that were discovered in the stop of his person and the search of his person were a small amount of usable cocaine and the lock and a sock. But the fact that the defendant has standing to challenge that does not mean that he has standing to challenge the search of the car. And it's in the car where the critical evidence was found, namely the 56.7 grams of cocaine and the paraphernalia. And even if the stop of the defendant were itself wrong, unless the defendant has standing to challenge the search of the Saturn, he doesn't have standing to raise an argument of taint with respect to the Saturn. That suggests a lack of confidence in your reasonable suspicion arguments. Do you want to touch briefly on those? I would love to touch on that. And I would like to point out, Judge Lynch, you have referred to reasonable suspicion. The discussion with defense counsel was on probable cause. And the standard is a lesser standard with respect to reasonable suspicion. And that's what is needed to justify the stop. As the court is very familiar with the standard, but I would emphasize that the court has even very recently said that the interpretation of the facts are to be viewed through the eyes of trained police officers. So that connections that they make among evidence that might elude the rest of us, they are allowed to rely on that. Let me summarize what the reasonable suspicion was. The officers knew that McGee was a drug seller because they had observed him making two drug transactions in 2011. They knew that Jones was a drug buyer because they had watched him. They had seen him buy drugs. To answer your question, Judge Lynch, they had listened to him on a series of wiretaps. They knew that he and McGee were discussing drugs. They knew that Jones had bought drugs on September 16th, which was four days before the events in this case. They knew that Jones was recorded discussing meeting McGee at Rusky's, which is a place they knew was a venue for drug transactions. They knew that Jones had agreed to go to McGee's house where they could infer that the limited transaction was yet another drug sale. And here's the important part with respect to this defendant. It's the conversation between Jones and McGee. Is Craigie still out there at Rusky's? Tell Craigie to wait there. Two important aspects of that. One is a discussion about a meeting at a place where the police know drug transactions have taken place and an instruction to a named individual to wait. And when the police get to Rusky's, what they see is a man outside the bar walking back and forth as if he's obviously waiting for somebody. McGee shows up. There's a transaction in the car. The agents can't see it. It's as if the bench here were the car. They duck down. You can't see in it. Mercer never goes inside of Rusky's. McGee does. Mercer comes back, excuse me, McGee comes back out. Mercer immediately leaves and the police stop him and find 56 grams of cocaine. So in the government's view, that is probable cause. So it by definition satisfies the standard of reasonable suspicion. But to get to Judge Lynch's question about the traffic violations, I understand, and I was looking to find the page so I could give it to you, but the defendant conceded that he made one lane change without signaling. It's the first one. And my recollection of the record, and, again, I can provide it in a 28J letter, my recollection is that the defendant conceded that a lane change without signaling is a violation of Maine law. So that combination of factors justifies the stop on reasonable suspicion based only on the first lane change, not on the second lane change. Thank you. If the court has further questions about any of the issues, I'd be happy to answer them. But in the government's view, there was abundant probable cause and by definition reasonable suspicion for the stop. Why didn't the officer at Rusky's follow the car if he had a basis for the stop? It sounds like the Maine State Police have some system where if the officer on the scene has some doubt, he calls up headquarters and says, so send another officer after him. Maybe we'll catch him on a pretextual traffic stop. That's not what happened here, Judge Lynch. It's quite clear from the record that the reason that the drug agents asked for the Portland Police was because the wire was still up and they didn't want to compromise the wire. They gave the police officer explicit instructions that they should find a traffic violation, stop him, identify him, and let him go. But what happened was when they stopped him and they identified him, they found that he was a subject to active arrest warrants, so they really couldn't let him go. But it's not the subterfuge that I fear you might have in mind with respect to this case. The record certainly suggested it. I take your rebuttal to the suggestion. That is in the record. And if the court would like me to identify the pages of the record where that appears, I'd be happy to do that. If the court has other questions, I would love to answer them. Otherwise, the government will urge the court to affirm. Thank you. Thank you. All right. We'll take a break right now. Oh, I'm sorry. I forgot about you. Judge Lynch, you made a point about bad faith regarding the late disclosure. I just want to point out that under Lanoue, Lanoue states that the court does not have to find bad faith. No, but you suggested it in the argument without any basis in the record to do so. So please be more careful. Well, I think it is in the record. I think it's very implicit in the record. But since I have short time, I will move on. And as far as ineffective assistance of counsel, what did trial counsel know at the time of trial? He actually states it's either on Record Appendix Page 623 or 624. I'm giving a rough quote. He basically says, I, David Van Dyke, never knew who those calls were to and what those calls were about. So I would at least ask this court to remand for an evidentiary hearing under. Why would we remand? Why wouldn't we just let you independently do what you seem to be intent on doing, which is to make an ineffective assistance of counsel claim by a post-conviction petition? Because I'm not asking for anything different than what Mr. Constant received. And I think the standard is met under Constant's own terms, which is has the defendant shown significant indicia of ineffectiveness? And he has, because any competent attorney would have either reviewed these records. He knows they are from his own client's phone. He must know that it's on or about the date of the actual offense, because the phone was obviously if he looked at the documents. And he seems pretty clear to me from what he says to the court that he did not review those records. And if he doesn't review them or doesn't have time to review them, given it's only a week before trial, then he has to, as in Delgado-Morero, move to continue. And he did not do that. Thank you. Thank you.